IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BERNICE BOYD, Individually and as    §
Personal Representative of the Estate of   §
Terreth Allen White, a/k/a Terreth Allen-Jure  §
White, Deceased,                §
                                  §
        Plaintiff,            §
V.                            §    CIVIL ACTION NO. H-08-2371
                                  §
ROBERT EARL GROOMS; ROBERT J.   §
JENKINS, JR.; DIANA M. SHUPAK;    §
MARY L. THORNTON; JANE AND/OR   §
JOHN DOE #1, #2, #3, #4, #5, TEXAS   §
DEPARTMENT OF CRIMINAL JUSTICE §
GUARDS AND/OR UNIVERSITY OF    §
TEXAS MEDICAL BRANCH-MANAGED§
CARE HEALTH CARE PROVIDERS,   §
                                  §
        Defendants.        §

## MEMORANDUM AND OPINION

Plaintiff Bernice Boyd brings this suit on behalf of her grandson, Terreth Allen White,

deceased, alleging constitutional violations under 42 U.S.C. § 1983. Boyd brings suit

individually and on behalf of the estate of her grandson seeking damages arising out of her

grandson's death while an inmate at the Estelle Unit in Huntsville, Texas. Boyd, proceeding

with the assistance of counsel, sues Robert Earl Grooms, a Sergeant at the Estelle Unit;

Robert J. Jenkins, a Lieutenant at the Estelle Unit; Diana M. Shupak, a Sergeant at the Estelle

Unit; Mary Thornton, a nurse at the Estelle Unit; John or Jane Does ## 1-5;, Department of

Criminal Justice guards and/or the University of Texas Medical Branch - Managed Care

health providers. Boyd alleges that defendants failed to provide medical assistance and medication to her son between August 1, 2006 and August 5, 2006, and that defendants' deliberate indifference to her grandson's serious medical needs caused his death. Before the Court are the following:

1.      Defendant Grooms, Jenkins and Shupak's ("Grooms, et al") Partial Motion to Dismiss (Docket Entry No. 3);

2.      Defendant Thornton's Motion to Dismiss for Lack of Standing (Docket Entry No. 4);

3.      Plaintiff's Response to Defendants' Grooms, et al. Partial Motion to Dismiss (Docket Entry No. 5);

4.      Defendants' Grooms, et al. Reply to Plaintiff's Response (Docket Entry No. 8);

5.      Plaintiff's Response to Defendant Thornton's Motion to Dismiss (Docket Entry No. 9);

6.      Plaintiff's Surreply to Defendants' Grooms, et. al. Reply (Docket Entry No. 11);

7.      Plaintiff's First Amended Complaint (Docket Entry No. 13);

8.      Defendant Thornton's Motion to Dismiss Plaintiff's First Amended Complaint (Docket Entry No. 16);

9.      Plaintiff's Response to Defendant Thornton's Motion to Dismiss (Docket Entry No. 19);

10.     Defendant Grooms, Jenkins and Shupak's Motion for Summary Judgment (Docket Entry No. 21);

11.     Plaintiff's Response to Defendants' Motion for Summary Judgment (Docket Entry No. 24);

12.     Defendants' Grooms, et al Reply to Plaintiff's Response (Docket Entry No. 26);

13.     Plaintiff's Notice of Probate Order Approving Plaintiff's request to proceed with this lawsuit as the personal representative of the deceased, Terreth Allen White.

## I.     Plaintiff's Allegations

Boyd's grandson, Terreth Allen White, was born October 5, 1984. In May 1988, the Harris County District Court, Family Division, appointed White's paternal grandmother, Plaintiff Bernice Boyd, to be his managing conservator after his father was incarcerated and his mother's whereabouts became unknown. Throughout his youth and teen years, he suffered from borderline mental retardation, seizures and schizoaffective disorder and was considered disabled. He struggled with medical and psychological problems and had multiple psychiatric hospitalizations with a complex social, medical and psychological history.

In his late teens, White was sent to the Texas Youth Commission, the Hamilton Unit, in Bryan, Texas for an incident of drug possession. While at the Youth Commission, White was charged with assault when he allegedly injured a state employee of the Youth Commission. While awaiting sentencing, he resisted the efforts of several guards to move him from his cell and a second altercation occurred.

On June 26, 2002, White was sentenced to eight years confinement in the Texas Department of Criminal Justice for the assaults, and was assigned to the Estelle Unit in Huntsville, Texas. White spent the majority of his days confined to his cell with minimal

3

physical interaction with any persons.  He was able to speak to and see other inmates in cells across from, and near to, his own.

On unspecified dates, White reported that guards at the Estelle Unit had mistreated him on several occasions; he complained of the use of excessive force and the denial of meaningful, medical care and attention.  Plaintiff Boyd advised the then acting warden that prison guards had subjected her grandson to physical and emotional abuse, use of excessive force and denial of medical care and attention.

The TDCJ staff, UTMB-Managed Care health care staff and other inmates knew that White suffered from seizures.  When White suffered a seizure, he would collapse to the ground and lose consciousness for brief periods of time.

On August 1, 2006, an inmate saw White suffer a significant seizure that resulted in White falling to the floor of his cell, unconscious. (Docket Entry No. 13, Exh. 2).  The inmate reported White's condition to the unit guards and supervisors and asked for their help, but the inmate's requests were ignored.  The inmate noticed that White lay motionless and naked on the cell floor, and appeared to be in need of medical attention.  The inmate, as well as other inmates, observed that for days, White continued to lie apparently unconscious on the floor of his cell, immobile, without making any attempt to move or communicate.

After the August 1, 2006 seizure, inmates continued to report White's serious condition to unit guards and supervisors, who were aware of White's condition.  Defendants and other staff walked by White's cell daily, observed his immobile and non-communicative

4

condition and that he lay naked while on the floor of his cell, but mostly refused to investigate, intervene on his behalf or obtain medical assistance.

Inmates identified prison guards Grooms, Jenkins and Shupak as being consistently aware of White's condition but refusing to check on, assist White or seek medical assistance for him. During the next several days after August 1, 2006, inmates reported that they continuously yelled to these guards that White had suffered a seizure, was not moving, and desperately needed medical help, to no avail. Inmates reported that White lay on the floor of his cell most of the time from August 1, 2006 to August 5, 2006, at which time he was found dead. One witness thought he may have seen White rise on one occasion on or about August 3, 2006. Another inmate reported that guards entered White's cell on August 3, 2006, cleaned him up, then put him back on his cell floor naked and bleeding from his eye, and made no attempt to obtain medical attention for him.

On August 4, 2006, inmates watched White suffer four to five more seizures, one after the other, but guards continued to refuse to help him. One inmate reported screaming at officers Grooms, Jenkins and Shupak to get help and take White to the medical facility across the street, but his requests were ignored. During the afternoon of August 4, Mary Thornton, a licensed vocational nurse employed by the University of Texas Medical Branch-Managed Care division who had a history of abusing prisoners, directed Defendant Jenkins to take White out of his cell. (Docket Entry No. 13, Exh. 3). Jenkins stated it was a waste of time to help him. A five-man team eventually entered White's cell, at which time White was

observed to have blood on his face and appeared to be unconscious.  An inmate reports that a prison guard tried to revive White with smelling salts but White did not respond.

Early in the morning of August 5, 2006, one guard expressed that something was wrong with White and tried to get help for him.  However, records reflect that by that time, it was too late.  White was taken out of his cell to the medical unit for treatment, where it was determined that he had been dead for some time.  White was twenty-one years of age at the time of his death.

White's autopsy report stated that White had multiple bruises, abrasions and lacerations of multiple and differing ages over his body, a healing laceration to his right lower lip, and signs of decomposition.  The cause of death was thought to be myocardial bridge and seizure disorder, although his medical history reported no history of heart-related issues.

Boyd seeks the following relief:

1.      compensatory damages;

2.      punitive damages;

3.      prejudgment and postjudgment interest;

4.      costs and fees

(Docket Entry No. 13)

Defendant Thornton has moved to dismiss on the ground that Boyd lacks standing to bring suit under the Wrongful Death Act and the Texas Survival Act.  Defendants Grooms,

Shupak and Jenkins have moved to dismiss because Boyd lacks standing to bring suit under the Wrongful Death Act, or, alternatively, for summary judgment.

## II.     Motion to Dismiss - Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the filing of a motion to dismiss a case for failure to state a claim upon which relief can be granted.  FED. R. CIV. P. 12(b)(6).  While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of actions' elements will not do. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotations omitted).  A plaintiff must allege enough facts to state a claim to relief that is "plausible" on its face. *Id.* at 570.  A claim is facially plausible when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, --- U.S. ---, ---, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (*Id.*).

A Rule 12(b)(6) motion to dismiss "is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982).  Therefore, the complaint must be liberally construed in favor of the plaintiff, all reasonable inferences are to be drawn in favor of the plaintiff's claims, and all factual allegations pleaded in the complaint must be taken as true. *Campbell v. Wells Fargo Bank*,

781 F.2d 440, 442 (5th Cir. 1986). In ruling on a Rule 12(b)(6) motion, "courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1017 (5th Cir. 1996).

### III.    Standing

Defendant Thornton moves to dismiss on the grounds that Boyd lacks standing to bring suit under the Wrongful Death Act, the Texas Survival Statute, and under FED. R. CIV. P. 17(a)(1). (Docket Entry No. 16).

In response to Thornton's Motion to Dismiss, Boyd asserts that: (1) she is entitled to proceed with this suit under FED. R. CIV. P. 17(a)(1); (2) she is entitled to proceed with this suit under the Texas Wrongful Death Statute because she entered into a contract with her son, (Terreth White's father), to proceed on his behalf (Boyd asserts, however, that this issue is now moot because she was officially appointed administrator of the estate of Terreth White by Probate Court of Harris County, Texas, on November 18, 2008 (Docket Entry No. 19); and, (3) she is entitled to proceed under the Texas Survival Statute and the Texas Civil Practice and Remedies Code Ann. § 71.021(b), which specifically identifies both the father and the grandmother to be heirs through decent and distribution. (*Id.*).

Survival actions under § 1983 are governed by 42 U.S.C. § 1988, which directs the courts to look to the law of the forum state. *Robertson v. Wegmann*, 436 U.S. 584 (1978). The Fifth Circuit has consistently borrowed from the Texas survival and wrongful death statutes in determining who has standing to bring such claims under § 1983. *See Pluet v.*

*Frasier*, 355 F.3d 381, 383 (5th Cir. 2004) ("Standing under the Civil Rights Statutes is guided by 42 U.S.C. § 1988, which provides that state common law is used to fill gaps in administration of civil rights suit."); *Aguuillar v. McGowen*, 207 F.3d 226, (5th Cir. 2000). This court looks to Texas state law to determine whether Boyd has standing to assert a wrongful death or survival claim under 42 U.S.C. § 1983. *Id.*; *Aguillar*, 207 F.3d at 231.

A survival claim belongs to the decedent because it arises from injuries sustained while the decedent was alive. *Austin Nursing Ctr. v. Lovato*, 171 S.W. 3d 845, 849-50 (Tex. 2005). A survival action "preserves a claim for the estate rather than creating a new cause of action for those surviving the decedent." *Id.*, *see also Pluet*, 355 F.3d at 384. Section 71.021 provides that "[a] personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.021 (Vernon Supp. 2009). Generally, "only the estate's personal representative has the capacity to bring a survival claim." *Austin Nursing Center*, 171 S.W. 3d at 850 (citing *Frazier v. Wynn*, 472 S.W.2d 750, 752 (Tex. 1971)). Pursuant to this provision, Bernice Boyd has provided proof that she is the legal representative of the estate of Terreth White (Docket Entry No. 19, Exh. B) and that the she has received approval from the Probate Court No. 1 of Harris County, Texas, to proceed with this lawsuit individually and as personal representative of the estate of Terreth Allen White. (Docket Entry No. 33, Exh. A).

Boyd does have standing to bring an action under the Texas Survival Statute.

Defendant Thornton and Defendant Grooms, Shupak and Jenkins also move to dismiss on the ground that Boyd lacks standing to sue under the Texas Wrongful Death

Statute. In response, Boyd asserts that she is entitled to bring suit under the Texas Wrongful Death Act on behalf of the estate in her capacity as executor of the estate, and, as the assignee of the rights of her son, who could have brought the action as a legal heir.

Under the Texas Wrongful Death Act, (the "Act") , an action for damages arising from the death shall be for the "exclusive benefit of the surviving spouse, children and parents of the deceased." TEX. CIV. PRAC. & REM. CODE. ANN. § 71.004 (Vernon 2008). The Act contemplates that only one action will be brought and requires the action to be prosecuted for the benefit of all who are so entitled under the Act. *Avila v. St. Luke's Lutheran Hosp.*, 948 S.W. 2d 841, 850 (Tex.App.-San Antonio 1997, writ denied). If no statutory beneficiary files a wrongful death action within three calendar months after the death of the injured individual, the administrator or executor of the decedent's estate may file, unless requested not to by all those individuals. § 71.004(c).

At the time of his death, Terreth Allen White had no spouse or children but was survived by his parents. Neither parent filed an action within three months, nor did they request that Boyd not file. Therefore, as executor of White's estate, Boyd has standing to bring suit under the Texas Wrongful Death Statute for the benefit of all statutory beneficiaries. *See Serv-Air, Inc. v. Profitt,* 18 S.W.3d 652, 664 (Tex.App.-San Antonio 2000).

## IV.    Legal Standard - Motion for Summary Judgment

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Christopher Village, L.P. v. Retsinas*, 190

F.3d 310, 314 (5th Cir. 1999).  "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, *Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 523 (5th Cir. 1999), *cert. denied*, 529 U.S. 1020 (2000).  A movant for summary judgment makes such a showing by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues to support the nonmovant's case. *Celotex Corporation v. Catrett*, 477 U.S. 317, 323 (1986).  The pleadings, depositions, admissions, and affidavits, if any, must demonstrate that no genuine issue of material fact exists. FED. R. CIV. P. 56(c).

Once the movant makes this showing, the nonmovant may not rest on the allegations in his pleadings. *See Isquith for and on behalf of Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 199 (5th Cir.), *cert. denied*, 488 U.S. 926 (1988).  Rather, he must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324; *Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986).  "Although we consider the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmovant, the nonmoving party may not rest on the mere allegations or denials of its pleadings, but must respond by setting forth specific facts indicating a genuine issue for trial." *Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999), *cert denied*, 528 U.S. 1160 (2000).

11

### V.    Plaintiff's claim under § 1983

To state a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) a violation of the United States Constitution or of federal law; and (2) that the violation was committed by someone acting under color of state law. *See Attenberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252-53 (5th Cir. 2005). In this case, Boyd claims that defendants were deliberately indifferent to Terreth White's serious medical needs, in violation of the Eighth Amendment. Defendants argue that Boyd has failed to establish a constitutional violation and that, even assuming such a violation, they are entitled to qualified immunity because they were not working the night that White died.

The doctrine of qualified immunity protects government officials sued pursuant to § 1983 from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, --- U.S. ---, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Id.* This doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 351 (1986).

Courts generally apply the two-pronged analysis established in *Saucier v. Katz*, 533 U.S. 194 (2001), in determining whether a government official is entitled to qualified immunity for an alleged constitutional violation. The first prong of the *Saucier* analysis asks

12

whether, taken in the light most favorable to plaintiff, the facts alleged show that the official's conduct violated a constitutional right. *See Scott v. Harris*, 550 U.S. 372 (2007) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)).  Under *Saucier*, if, and only if, the court finds a violation of a constitutional right, the court then asks whether the right was clearly established in light of the specific context of the case.  *Id.*  If there is evidence to support the violation of a constitutional right, the court asks whether, nevertheless, qualified immunity is appropriate because defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *Hampton Co. Nat'l Sur., L.L.C. v. Tunica County, Miss.*, 543 F.3d 221, 225 (5th Cir. 2008).

The Supreme Court has recently clarified that it is no longer mandatory for courts to consider the two prongs set out in *Saucier* in order, although the Court noted that it may be beneficial to do so. *Pearson*, 129 S.Ct. at 815.  Under *Pearson*, courts are now permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed in light of the circumstances in the particular case at hand. *Id.*

The usual summary judgment burden of proof is altered in the context of a defense of qualified immunity. *See Gates v. Tex. Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008).  An official need only plead his or her good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)).  To defeat a defense of qualified immunity and avoid summary

judgment, the plaintiff need not present "absolute proof," but must offer more than "mere allegations." *Ontiveros v. City of Rosenburg, Tex*, 564 F.3d 379, 381 (5th Cir. 2009) (quoting *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991)).

The Court must determine if Boyd has alleged a violation of a constitutional right. Boyd alleges that Defendants Groom, Jenkins and Shupak were on duty between August 1, 2006 through August 4, 2006, yet refused to and/or delayed summoning and providing readily available medical care and treatment.

The Eighth Amendment proscribes deliberate indifference to the serious medical needs of prisoners. *Harris v. Hegman*, 198 F.3d 153, 159 (5th Cir. 1999); *Estelle v. Gamble*, 429 U.S. 97 (1976). "Deliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001); *McCormick v. Stadler*, 105 F.3d 1059, 1061 (5th Cir. 1999). A defendant's conduct must rise "to the level of egregious conduct." *Gobert v. Caldwell*, 463 F.3d 339, 351 (5th Cir. 2006). A plaintiff complaining of deliberate indifference  must allege and raise a fact issue as to whether prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). The United States Supreme Court has adopted "subjective recklessness as used in the criminal law" as the appropriate definition of deliberate indifference under the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994). A prison official cannot be found liable under the Eighth Amendment unless the official knows of and disregards an

excessive risk to inmate health or safety. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference. *Farmer*, 511 U.S. at 837. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Id.* at 842. A prison official must show that he was "unaware even of an obvious risk to inmate health or safety." Medical records showing that an inmate received treatment may rebut the inmate's allegations of deliberate indifference. *See Varnado v. Lynaugh*, 920 F.2d 320 (5th Cir. 1991).

In her amended complaint, Boyd states that the TDCJ refused to produce hundreds of documents and files related to this case because, *inter alia*, the State internal, civil and criminal investigation of White's death was still on-going nearly two years after his death. (Docket Entry No. 13, p. 3). She therefore supports many of her factual assertions with affidavits provided by inmates who witnessed the events made the basis of this suit and filed written grievances and affidavits. Boyd submitted a grievance filed by inmate # 783089, (Docket Entry No. 1, Exh. 2), dated August 7, 2006, which states that defendants refused medical treatment for White after they were notified that White had suffered a seizure and was laying of the floor of his cell. The inmate also states that Defendant Jenkins complained about being summoned to check on White because he was tired. Jenkins only called in a five man team to White's cell after nurse Thornton threatened to report him to Dr. Healy if he didn't call the team to remove White from his cell. The inmate further states that the five

15

man team checked on White, who was having difficulty breathing, then left him lying naked on his cell floor.

Boyd  also submitted the affidavit of inmate Pedro Esquivel, Jr. (Docket Entry No. 24, Exh. 4). In his affidavit, dated December 2, 2008,  Esquivel states that White had a seizure on August 1, 2006. He heard inmate Bruno Howard call for help.  Officers periodically checked on White when he had a seizure, but would do nothing, leaving him lying on the floor. On "the second day after White's first seizure," an officer asked White if he wanted a meal tray. White was non-responsive. On the third day, White was taken to medical then returned to his cell and placed on the floor. On the fourth day, Esquivel asked nurse Thornton to check on White because he was having another seizure.  Thornton summoned Defendant Shupak, who told her that there was nothing wrong with White because it looked like he was moving.  Defendant Grooms then arrived at the scene; Thornton told Grooms and Shupak that she wanted White removed from his cell, but they refused to do it.  Shupak, Grooms and Thornton left briefly, then Thornton and Jenkins returned to White's cell. Esquivel states that when Thornton told Jenkins that she wanted White removed from his cell, Jenkins told her that it was a waste of his time to look in on White and that he was tired. When Thornton threatened to report Jenkins to Dr. Healy if he didn't remove White from his cell, Defendant Jenkins ordered a five-man team to suit up. The team entered White's cell "and got on top of White," then they left, leaving White lying on his cell floor naked and unconscious. Esquivel states that White was having difficulty breathing.  The next shift reported on August 4, 2006.  Esquivel asked officer Bartow to

check on White. Bartow summoned Sergeant Longenbaugh, who looked in White's cell then left. Bartow told Esquivel that he would keep an eye on White. The next morning when Esquivel awoke, Bartow told him that White had been found dead in his cell. Esquivel filed a grievance stating that Bartow was aware of White's condition for the days leading up to White's death. He was informed that Bartow had been transferred to another unit.

Boyd also submitted the affidavit of inmate Arcade Joseph Comeaux. (Docket Entry No. 24, Exh. 5). Comeaux asserts that officer Bartow asked him to "write something up to get Mr. White some medical help." Bartow told Comeaux that he had asked his supervisor to obtain medical attention for White but the supervisor did nothing. On the night of White's death, Bartow told Comeaux that White was going to die, that he had been having non-stop seizures for three days and had had nothing to eat or drink during that entire time. Bartow said that he had called Lt. Roberts and was told not to call him anymore about White's condition. Comeaux states that Bartow was extremely upset about White's death and gave a tape recorded statement.

Boyd also submitted the affidavit of inmate Antonio Ray Anthony (inmate # 639028) (Docket Entry No. 24, Exh 6). From his cell, Anthony could easily see into White's cell. He recalls seeing White lay on the floor of his cell, unresponsive. He states that officer Bartow was frustrated because he was unable to get anyone to listen to him regarding White's condition. Anthony saw Defendants Jenkins, Grooms and Shupak bang on White's cell trying to get a response from him, then they left and came back with a video camera and a five man team. The five man team handcuffed White, who was unconscious, transported him

off the wing, then brought him back to his cell and put him back on the floor. The next night, White was removed from his cell and did not return.

Defendants move for summary judgment on the basis of qualified immunity. In support of their motion for summary judgment Grooms, Shupak, Jenkins have filed sworn affidavits, and the affidavit of Robert Treon. (Docket Entry No. 21).

Defendant Robert Grooms is currently a Sergeant at the Estelle Unit. He states in his affidavit (Docket Entry No. 21, Exh. 1) that he was on duty at the Estelle Unit between August 1, 2006 and August 4, 2006. He recalls that the medical staff checked on White several times during this time period. He witnessed a five-man team enter White's cell on August 4, 2006. The team told Grooms that White was medically clear. Grooms was working the day shift on August 4, 2006, that ended at 6:00 p.m. He states that during his shift, he saw White alive in his cell.

Defendant Robert Jenkins, Jr. was working at the Estelle Unit as a Lieutenant between August 1, 2006 and August 4, 2006. He states in his affidavit (Docket Entry No. 21, Exh. 2) that he received a call on August 4, 2006, advising him that White was unresponsive in his cell; he authorized a five-man team to enter White's cell and check on him. Medical staff cleared White and he was breathing. He recalls that White moved, lifted his head and opened his eyes. He states that the medical staff checked White twice on August 4, 2006, and each time he was cleared by medical and did not need to be transported. Jenkins was working the day shift on August 4, 2006, that ended at 6:00 p.m. He states that during his shift, he saw White alive in his cell. At the end of his shift he "advised the next shift

lieutenant to check on Mr. White because he had been seen by medical staff already that day."

Defendant Diana Shupak was working at the Estelle Unit as a Sergeant between August 1 and August 4, 2006. She states in her affidavit (Docket Entry No. 21, Exh. 3) that during this time period she checked on White regularly and each time found that he was alive and breathing. She entered his cell with a five-man team on August 3 and August 4, 2006, each time with medical staff. She was told by the medical staff that White was cleared and did not need to be shipped off the unit for treatment. Shupak was working the day shift on August 4, 2006, that ended at 6:00 p.m. She states that during her shift, she saw White alive in his cell.

Respondent has also included the affidavit of Robert Treon, Region I Director with the TDCJ in Huntsville, Texas. In his affidavit (Docket Entry No, 21, Exh. 4), Treon states that TDCJ policy dictates that security officers defer to medical staff on all matters involving medical treatment for inmates; do not make value decisions regarding the health of an inmate; and are directed to call medical personnel for issues regarding the health of an inmate. Treon states that part of his job involves reviewing events surrounding an inmate's death and making a determination as to the appropriateness of officers' conduct. He reviewed events leading up to White's death and found that TDCJ officers on duty "during the evening-to-early morning shift of August 4-5, 2006," regularly consulted with medical personnel at the unit regarding White's medical condition. "This practice is consistent with TDCJ policy for security officers." He also states that "during the previous shift on August

4, 2006, the officers on duty regularly consulted with medical personnel regarding White's health and followed the direction of those medical personnel." These officers included defendants Grooms, Jenkins and Shupak. Treon concludes that "the conduct of Grooms, Jenkins and Shupak was reasonable and entirely appropriate and consistent with both their training and TDCJ 'policies and procedures.'"

This Court finds, deciding all reasonable doubts and inferences in the light most favorable to plaintiff, that the evidence demonstrates that there are genuine issues of material fact regarding whether defendants were deliberately indifferent to White's serious medical needs. The evidence raises an issue as to whether White needed emergency medical attention and whether defendants were aware of this but, over a four day time span, did not seek such attention for White. It is possible that a reasonable juror could infer that defendants may have been aware that White was in imminent danger but that they nevertheless acted unreasonably (with deliberate indifference). Relevant to this determination is what defendants actually saw over the four day time span, and whether medical help was appropriately sought prior to the days preceding White's death. Inmates living in cells near White's testify that White lay mostly unconscious and naked on his cell floor for almost four days prior to his death, yet defendants offer no testimony regarding their actions during most of this time period. If anything, a jury might find the defendants' accounts to be incredible and may determine that they were actually aware of the imminent danger that White was in but failed to do anything about it until it was far too late.

Under these inconsistent and incomplete facts, a reasonable jury could conclude that defendants deliberately did not respond timely to the needs of White and that their delay in seeking medical intervention lead to his death. The relevant historical facts pertaining to defendants actions are in dispute, and therefore, this case is appropriate to send to a jury. *See Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993) (citation omitted). Credibility assessments and choices between conflicting versions of events are ordinarily matters for a jury to resolve, not the court on summary judgment. *See Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (holding that in light of "several diametrically opposed summary judgment affidavits" on the issue of probable cause, qualified immunity turned on fact issues that "must be resolved by further proceedings in the trial court"); *see also Athridge v. Rivas*, 312 F.3d 474, 478 (D.C.Cir. 2002); *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999) ("Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment."). This is especially true in a situation where the only witnesses are prison inmates, who have nothing to gain in this matter, and prison employees, who, as named defendants in the case, may have an incentive to provide misleading, self-serving accounts.

Because there are multiple factual issues in dispute, the Court cannot determine at ths juncture whether defendants' conduct was objectively reasonable as a matter of law, precluding the Court from granting summary judgment on the grounds of qualified immunity.

## VI.    Conclusion

1.    Defendants Grooms, et al. Motion for Partial Dismissal (Docket Entry No. 3) is **DENIED** to the extent defendants claim that plaintiff is not entitled to bring suit under the Texas Wrongful Death Statute for the benefit of statutory beneficiaries in her capacity as official administrator of White's estate;

2.    Defendant Thornton's Motion to Dismiss for lack of standing **(Docket Entry No. 4) is DENIED;**

3.    Defendant Thornton's Motion to Dismiss Plaintiff's First Amended Complaint **(Docket Entry No. 16) is DENIED.**

4.    Defendant Grooms, Shupak and Jenkins''s Motion for Summary Judgment **(Docket Entry No. 21) is DENIED;**

5.    Defendant Thornton's Motion for Leave to File Advisory to the Court out of Time **(Docket Entry No. 22) is GRANTED.**

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the ⟋⟍⟍ day of September, 2009, at Houston, Texas.


**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**